UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSACHUSETTS MUSEUM OF CONTEMPORARY ART FOUNDATION, INC., <br><br> Plaintiff/Defendant-in-Counterclaim, <br><br> v. <br><br> CHRISTOPH BÜCHEL, <br><br> Defendant/Plaintiff-in-Counterclaim. | CIVIL ACTION NO. 3:07-30089-MP |

## AFFIDAVIT OF CHRISTOPH BÜCHEL

Christoph Büchel deposes and says:

1.      I am a visual artist.  I was born in 1966, am a citizen of Switzerland and live and primarily work in Basel, Switzerland.

2.      I submit this affidavit in support of my motion for summary judgment.

3.      I studied at the School of Art and Design in Basel, Switzerland from 1986 to 1989, at Cooper Union School of Art in New York from 1989 to 1990, and at the Kunstakademie Düsseldorf in Germany from 1992 to 1997.

4.      I work in a variety of media.  Among other things, I create conceptual projects and large-scale art installation pieces.  For the last twenty years, I have been creating artwork and exhibiting it internationally. I have edited several books and catalogues.   A copy of my curriculum vitae and several reviews are attached hereto at Exhibit 1.

### "Training Ground for Democracy"

5.      In October 2005, the Massachusetts Museum of Contemporary Art Foundation, Inc. ("MASS MoCA") approached me about exhibiting my artwork at the museum, and in 2006

MASS MoCA invited me to create a new installation in its Building 5 gallery in North Adams, Massachusetts.

6.      In November 2005, I sent a rough outline for an installation to MASS MoCA's curator, Nato Thompson. My outline proposed a mock up training ground for a ficticious society with the basics of a city (homes, shop, bar, restaurant, school, library, museum, prison, tribunal) and a giant rock sitting in the first part of the space as an obstruction and accident. The installation's structue would serve as a vessel for citations to and narration of different mediated American myths, as well as current politics.

7.      Later, in the Spring of 2006, I proposed an installation inspired by existing mock-up villages and virtual reality training software that the U.S. army designed to train its members to tackle battle situations in the war on terror and the Iraq war. The title of the work was "Training Ground for Democracy."

8.      "Training Ground for Democracy," essentially a village, was to have contained several major architectural and structural elements integrated into a whole, through which a visitor could walk (and climb). It was to adopt the role-play of U.S. military training for its visitors, who would be given the opportunity to "virtually" change their own various identities in relation to the collective project called "democracy": training to be an immigrant, training to vote, protest, and revolt, training to loot, training iconoclasm, training to join a political rally, training to be the objects of propaganda, training to be interrogated and detained and to be tried or to judge, training to reconstruct a disaster, training to be in conditions of suspended law, and training various other social and political behavior. All of these concepts were to have been made visible in the final, installed work.

9.      The basic architectural structures of the work were meant to be found or rebuilt objects which would "house" the various social functions to which the work referred, in each case employing used elements such as a mobile home (to house a mobile tribunal), cargo containers (to house, among other things, illegal immigrants), a single family house divided by a wall, a 30-foot section of a destroyed passenger airplane fuselage (to simulate a disaster zone),

A/72189184.2/3006636-0000326542

and so on. The content of each component element, and its function within the overall work, was to have been defined by the specific details of each fictitious "situation." As thus designed, the work of art as a whole would be fully realized only when all of its elements were completed and fully detailed.

10.    My installation work is concerned, in part, with how the visitor interacts with the objects and spaces in the installation and how those objects and spaces interact with each other to trigger meaning for the visitor, both with regard to the installation as a whole and the smaller narratives within the installation. I generally do not develop or communicate my work from drawings or models, but rather work with photographs and printed materials from mass media (and in some cases basic sketches on the architectural plans of the specific site) that reflect my working method of montages of situations and spaces on site. I construct the installation on-site by means of juxtaposition and fit, and build the architecture from the inside out, relying on my experience. Because I work with used and found objects, I have found this method to be the most effective. I need to be flexible and react to these found objects; it is a construction process which one cannot plot out completely in a drawing.

11.    The placement, context and juxtaposition of spatial elements, the architectural structure of the exhibit -- both how a visitor sees and must pass through the installation as a whole -- is a critical feature of these kinds of installations.

12.    In a work like "Training Ground," one way that meanings are constructed is by arranging the details of the installation and methods of montage. This "detailing" principally occurs in the final days. The placement of every object, from the largest to the smallest, and their relation to each other, all conveys meaning to the viewer.

**The August 2006 Visit to MASS MoCA**

13.    In August 2006, I visited MASS MoCA as an artist in residence.

14.    At MASS MoCA's request, during my August 2006 residency, I, assisted by my partner Nina Magnusdottir, prepared a schematic model (with the help of an architectural cardboard model of Building 5 provided by MASS MoCA that was used for planning previous

- 3 -

exhibits of other artists in this space) of the proposed installation "Training Ground for Democracy." (Attached hereto at <u>Exhibit 2</u> are true and correct copies of photographs of the model taken during my residency.)

15.    The schematic model contained the major elements of "Training Ground for Democracy" and, among other things, smaller notes of scenes between these elements.  It indicated the structural elements of the cinema, house, mobile home, various sea containers and caravans (to house among other things a looted store, voting booths, museum, jail, a watch tower), a playground, a school, a disaster zone (consisting of a section of a passenger jet fuselage), a bomb carousel, mobile theater, mobile church, market, a statue, cinderblock walls, bar, barricades, several vehicles and other elements and scenes.

16.    During my ten-day residency in August 2006, MASS MoCA approved the proposed installation, as presented in the model (and with a set of pictures that I collected and assembled specifically for this project), and agreed to fund, to provide logistical and technical support for, to procure the necessary objects, and to exhibit the completed installation as proposed.

17.    I relied on MASS MoCA's claimed expertise in organizing and mounting large-scale and complex installations when I agreed to create "Training Ground for Democracy" for exhibition at MASS MoCA.

18.    MASS MoCA was responsible for procuring elements and objects for "Training Ground for Democracy."  Financial decisions relating to the procurement of elements and objects, such as price to be paid (if any), were MASS MoCA's and MASS MoCA's alone.

19.    I never had any discussion, let alone made any agreement, with MASS MoCA as to what would happen if the cost of completing of "Training Ground for Democracy" was more than MASS MoCA may have anticipated.

20.    I never executed any written agreement with MASS MoCA with respect to "Training Ground for Democracy."

21.    I never waived, in writing or otherwise, any of my rights under the Copyright Act 17 U.S.C. §§ 101 *et seq.*, including my rights under the Visual Artists Rights Act, 17 U.S.C. § 106A, in "Training Ground for Democracy" or any of its component elements.

22.    Although I intended "Training Ground for Democracy" as a single, unified work, the installation was to be composed of a number of elements, several of which could function as independent artworks in their own right.

23.    I am the sole author of "Training Ground for Democracy."

24.    "Training Ground for Democracy," even in its unfinished and distorted state, is not mere "Materials."

25.    I have attached a true and correct copy of an architectural plan of "Training Ground for Democracy," at <u>Exhibit 3</u>, which was prepared, among other specified construction plans, on November 10, 2006 by one of my assistants under my supervision. This plan indicates the main elements of "Training Ground for Democracy." *See also* Head Aff., Ex. 15 showing a plan that was used during the construction of "Training Ground for Democracy" (Thompson Dep. Ex. 9).

**Discussions About Funding**

26.    In the Spring of 2006, as I prepared the upcoming installation, I requested that MASS MoCA provide me with some estimate of how much money they had for the installation. On May 16, 2006, I sent an email to Nato Thompson, the curator for the installation, stating: "I also need to know how much money you have for the show. I need numbers" and "I would like to have a clear set up of what you can provide in terms of catalogue and budget and where you plan to apply for additional fundings." *See* May 16, 2006 email from me to Nato Thompson and response (BUC000002531-32) (Thompson Dep. Ex. 2) (A true and correct copy is attached hereto at <u>Exhibit 4</u>). I did not receive any estimate or numbers, nor a list in response to my request.

27.    The first time I received any indication of a MASS MoCA "budget" for "Training Ground for Democracy" was in a September 15, 2006 email to me, two weeks after I left North

A/72189184.2/3006636-0000326542

Adams and after my proposal had been approved. *See* September 15, 2006 email from Joe Thompson to me (BUC00002269-76) (A true and correct copy is attached hereto at Exhibit 5).

28.    In that email, Joe Thompson wrote that "I am terrified by the costs, by the way. So far we have zero in sponsorships, nada....If you have any ideas for that, let me know, as I really have to get to work on that right away." *Id.* (BUC00002269). In the same email Joe Thompson wrote: "[o]nly big things we haven't really nailed down yet are the house, and the big airplane fuselage."

29.    I responded to Joe Thompson's September 15, 2006 email on September 24, 2006. *See* Sept. 24, 2006 email from me to Joe Thompson (BUC00001939-43) (A true and correct copy is attached hereto at Exhibit 6).

30.    In my response, I wrote, in part: "[r]egarding budget: Please get in touch with my two galleries. they could provide you with potential sponsors like foundations. (pro Helvetia, nestle foundation for the arts, stanley thomas johnson foundation, culture department of basel-stadt which come to my mind for switzerland, there are many other foundations in switzerland for the arts, for the s[t]ates i haven't got a clue....") (Exhibit 6); *see also* Oct. 17, 2006 email from me to Nato Thompson (BUC00002293) (inquiring about MASS MoCA's efforts to obtain sponsorships) (A true and correct copy is attached hereto at Exhibit 7).

31.    I now know that as early as December 2005, MASS MoCA began to seek money for "Training Ground for Democracy" from my galleries. I had specifically told MASS MoCA that I did not want my galleries to contribute money to the installation. Because of my financial arrangement with my galleries, I would be responsible for fifty percent of any money they contributed to MASS MoCA, so in asking them to contribute, MASS MoCA was in effect asking me to contribute.

32.    In an email to Nato Thompson dated September 20, 2006, with regard to my assistants' compensation, I explained that "in general, i have to tell you that my galleries won't finance the show .... We will have to find other financial sources for the show. Please try to contact foundations, if you didn't already. Of course my galleries would be also helpful in

- 6 -

giving you contacts for fundraising." *See* Sept. 20, 2006 email from me to Nato Thompson (BUC000002313-16) (A true and correct copy is attached hereto at <u>Exhibit 8</u>).

**<u>MASS MoCA's Organizational Difficulties</u>**

33.    On October 29th, 2006, I returned to MASS MoCA to complete "Training Ground for Democracy." Three skilled assistants from Switzerland arrived shortly thereafter.

34.    Upon my return, I quickly became aware of numerous organizational and logistical difficulties that had arisen. Among other things,

- The Director, the Director of Fabrication and Art Installation, and the Production Manager of Visual Arts were all away.

- Removal of the previous installation in Building 5 was delayed almost three weeks and not completed until approximately November 15, 2006.

- The overhead door to Building 5 that MASS MoCA installed to allow larger objects to be moved into the gallery space had not been completed, and was not completed until approximately November 15, 2006.

- Several of the key elements were not organized. For example, no one from MASS MoCA had made contact with the cinema owner to coordinate the cinema's dismantling and removal, nor dismantled the cinema and moved it on site.

- MASS MoCA did not assign a project manager until December 15, 2006, although I had requested one for seven weeks.

35.    During the first week of December 2006, MASS MoCA postponed the opening. MASS MoCA posted the following explanation on its website:

> Due to logistical complexities **encountered by the museum** in preparing galleries for Christoph Büchel's vast installation, the exhibition's official opening date … will be re-scheduled…
>
> "While MASS MoCA is known for undertaking intricate and dramatically-scaled installations, this one is an order-of-magnitude more complex than anything we have attempted up to now, requiring, among other things, vast cement walls comprised of over 2 miles of cinder block, an immaculately detailed cinema, and thousands of specific found objects, some of which weigh over 20

A/72189184.2/3006636-0000326542

tons" said MASS MoCA Director Joseph Thompson. "Because of
these logistical challenges and some technical snags, the museum
needs a bit more time to provide the support this extraordinary
work deserves: we do not want to shortchange the quality of what
promises to be a landmark work of art ...."

(emphasis added) (A correct copy of the MASS MoCA website postponement announcement is

attached hereto at Exhibit 9).

**My Departure on December 17, 2006 for the Holidays**

36.     I remained at MASS MoCA through the planned opening date of December 16,

2006. I continued to work with my assistants on the installation until December 17, 2006, when,

as originally scheduled, I left North Adams for the Christmas holidays.

37.     When I left on December 17, 2006, I intended to return on January 8, 2007 to

complete "Training Ground for Democracy" for a planned March 3, 2007 opening.

38.     On December 7, 2006, Joe Thompson asked me to cancel an exhibition in Paris,

France at the Palais de Tokyo, a major contemporary art museum, which had been scheduled to

open on January 31, 2007. I also cancelled a scheduled show at Maccarone, Inc. in New York.

39.     I cancelled these exhibits so that I could return to MASS MoCA to complete

"Training Ground for Democracy." I requested, however, that Joe Thompson call Marc-Oliver

Whaler at the Palais de Tokyo to explain the situation, which, in an email to me, Joe Thompson

acknowledged that he did. *See* Dec. 13, 2006 emails between me and Joe Thompson (MASS

MoCA 03949) (A true and correct copy is attached hereto at Exhibit 10).

40.     From October 29 to December 16, 2007, while at MASS MoCA, I worked

continuously to create "Training Ground for Democracy." My assistants and I regularly spent

ten, twelve or more hours a day, including weekends, working on this project.

41.     When I left North Adams on December 17, 2006, the unfinished installation

reflected months of work by me, including approximately eight weeks spent in residence at

MASS MoCA.

**Events after December 17, 2006:  MASS MoCA Runs Out of Money**

42.    After I left MASS MoCA on December 17, 2006, but before the end of the year, my gallery representatives informed me that Joe Thompson had told them that MASS MoCA had run out of money to complete "Training Ground for Democracy," could not pay its bills, and could not pay my assistants.  These budgetary issues apparently existed while MASS MoCA allowed me to cancel two exhibitions, including one at the Palais de Tokyo in Paris, knowing that it did not have enough money to continue as planned.

43.    At the same time, I learned that (again against my express wishes) Joe Thompson had requested that my galleries contribute $100,000 to cover the museum's past expenses and $80,000 to complete the installation.

44.    On January 8, 2007, Joe Thompson sent a letter to Iwan Wirth at Hauser & Wirth, my European gallery.  I was not copied on the letter.  The letter stated that the museum had a significant budget overage and again requested that my galleries bail out the museum.  *See* Jan. 8, 2007 Letter from Joe Thompson to Iwan Wirth (BUC00000126-29) (Thompson Dep. Ex. 10) (A correct copy is attached hereto at Exhibit 11).

45.    In the letter, Joe Thompson said that, if Hauser & Wirth did not provide the money, my reputation as an artist would be harmed and there would be "substantial cutbacks" and "elimination of several other elements on Christoph's list." *Id.*

46.    Attached to the January 8, 2007 letter was a "budget summary" itemizing the Museum's expenditures for "Training Ground For Democracy" and indicating that MASS MoCA had spent about $100,000 more than budgeted. *Id.* (BUC00000129).

47.    The attached "budget summary" was the first accounting of MASS MoCA's expenses for "Training Ground for Democracy" that I had ever seen.

48.    The January 8, 2007 "budget summary" includes a cost of $89,000 for a house acquisition and moving. *Id.*  I have since come to learn that the acquisition of the house did not cost the museum anything, as Joe Thompson now admits the house was donated.  The supposed

"cost" of the donated house accounts for a substantial portion of the alleged "budget overage" referenced in Joe Thompson's January 8, 2007 letter. *Id.*

**MASS MoCA's Post December 17, 2006 Work on "Training Ground for Democracy"**

49.    On December 17, 2006, "Training Ground for Democracy," while not finished, was a work in progress -- an unfinished work of art, on its way to completion. Many major structural elements had been constructed in Building 5. Among other things, my assistants and I had constructed and started to detail several containers, had constructed parts of the Saddam Compound (including a hut and "spiderhole" recreating the location where the U.S. military captured Saddam Hussein), and the cinema construction was underway.

50.    After my departure on December 17, 2006, I received several emails from Dante Birch, MASS MoCA's Production Manager of Visual Arts, and the project manger assigned to "Training Ground for Democracy," updating me on the progress of the installation.

51.    On December 22, 2006, Mr. Birch informed me that "in order to maintain [] your street and the room behind[,] **it was judged best to go off your center** line to maintain the integrity of your house divided down the center of the gallery while least impacting the other sides." In response, I asked that they "pls call me when a major problem like this with the house happens" and requested that "please wait now to attach … the two entrance parts to the house." *See* Dec. 22 and 23, 2006 emails between Dante Birch and me (BUC00001752-53) (emphasis added) (A true and correct copy is attached hereto at Exhibit 12). *See also* Dec. 26, 2006 email from me to Dante Birch (BUC00001750) (A true and correct copy is attached hereto at Exhibit 13).

52.    On January 5, 2007, I received another email update from Mr. Birch describing the work done in the past week. He indicated that "the exterior block walls are being done to your drawing." I responded that they were using "outdated drawing[s]" based on "another house," and that the exact course of the wall was not yet clear as I had told them when I left. *See* Jan. 5, 2007 emails between Dante Birch and me (BUC00001747-49) (A true and correct copy is attached hereto at Exhibit 14).

- 10 -

53.     Sometime thereafter, in January 2007, I stopped receiving regular email communications from MASS MoCA about construction on "Training Ground for Democracy." After January 6, 2007, I did not give instructions or my approval for any additional work done to the installation.

**MASS MoCA Cancels the Exhibition**

54.     As noted, I intended to return to MASS MoCA on January 8, 2007 in order to finish the installation, but postponed my return upon learning that MASS MoCA had run out of money, unable to even pay my assistants (or their flights to return). I sought assurances that "Training Ground for Democracy" could be completed as agreed upon. Because of MASS MoCA's financial issues, their organizational failures, and their lack of respect for my artistic judgment, my trust in this institution had eroded.

55.     Although efforts were made throughout the Winter and Spring of 2007 to reach a resolution, the differences proved irreconcilable and eventually MASS MoCA cancelled the exhibition.

**MASS MoCA's Intentional and Willful Modifications and Distortions to "Training Ground for Democracy"**

56.     I understand that MASS MoCA continued to work on "Training Ground for Democracy" until sometime in May 2007. As set forth in more detail below, much, if not all, of their work constitutes unauthorized modifications and distortions to "Training Ground for Democracy."

**The Evidence**

57.     From time to time in 2007, I have received and reviewed photographs of the installation. Some of those photographs were sent to me by Joe Thompson and other MASS MoCA employees.

58.     In March 2007, an employee of my U.S. gallery, John McLaughlin, went to MASS MoCA to try to retrieve my picture archive and files for this project. At that time, he took numerous photographs of the exhibit.

- 11 -

59.     I also reviewed a video taken of Building 5 in late May 2007, and still photographs from a camera in the mezzanine of Building 5 that continuously took photographs from mid-November 2006 until mid-February 2007.

60.     I have also seen photographs of "Training Ground for Democracy" on various websites and in newspapers.

61.     I have reviewed several emails produced by MASS MoCA in this litigation which describe work done on "Training Ground for Democracy" in 2007.

62.     I have also reviewed the deposition testimony of Joe Thompson.

63.     Finally, I have reviewed photographs taken at the court-ordered inspection on August 27, 2007.

64.     From these sources, I can identify several areas where MASS MoCA made changes to "Training Ground for Democracy" without my permission or approval and/or contrary to my instructions.  The changes, including but not at all limited to those identified herein, willfully distort and modify "Training Ground for Democracy."

**Cinder Block Walls**

65.     When I left MASS MoCA on December 17, 2006, I had not yet determined the exact course and height of the cinder block walls near the house (a reference to, among other things, the Berlin Wall, the Israel-Palestine "Security Wall," and the United States-Mexican "Wall") because MASS MoCA had not yet moved the house into the building.  I instructed MASS MoCA not to build the cinder block wall until my return.  *See* Jan 5, 2007 emails between Dante Birch and me (BUC00001747-49) (Exhibit 14).  However, without my approval, MASS MoCA built the cinder block wall, and completely blocked the entrances to one of the sea containers in construction, denying access to it.  *See also* Jan. 4, 2007 email from Joe Thompson to me (BUC00002208) ("We're waiting to do the east section, since you'll need to define the wall path – at some point that east section takes a bend, which is not yet specified") (A true and correct copy is attached hereto at Exhibit 15).

A/72189184.2/3006636-0000326542

66.    I also intended that portions of the cinderblock wall would remain incomplete and seemingly "in progress" -- a reference to the "reconstruction" business after a war and, at the same time, the segregation of a social body or society -- but MASS MoCA built them as complete walls without any instructions.  (A correct copy of my reference photograph is attached hereto at Exhibit 16; correct copies of photographs from the August 27, 2007 inspection are attached hereto at Exhibit 17).

67.    MASS MoCA also built the dividing wall inside the house, and created holes in it, without any instruction or approval by me.  MASS MoCA did not know how high the wall should be, what course it should take, where and which rooms the wall should divide on both floors, how the wall should run through the house, and in what state of construction the wall should appear.  (Correct copies of photographs from the August 27, 2007 inspection are attached hereto at Exhibit 18); *see* April 27, 2007 email from Bridget Hanson to Richard Criddle (MASS MoCA 17012-13) ("~~Dividing wall in house~~"; "~~Cinder block wall through house with shattered openings~~") (A correct copy is attached hereto at Exhibit 19).  I understand from my review of Ms. Hanson's April 27, 2007 email that a line through a task indicates that the museum had implemented that modification.

68.    Although there were discussions, I had not made a final decision on how the top of the cinder block wall bordering the cinema would appear.  In an email to me, Joe Thompson acknowledges that I had not completely decided on this element.  *See* Jan. 4, 2007 email from Joe Thompson to me (BUC00002208) ("I want to confirm treatment for barbed wire at the top of 20' cinder block wall.") (Ex. 15) (A true and correct copy is attached hereto at Exhibit 15).  Nevertheless, without my approval, MASS MoCA installed a treatment at the top of this wall.  Also, MASS MoCA, without any instruction or approval from me, blocked the windows in the Saddam compound area with cinderblock.  (Correct copies of photographs from the August 27, 2007 inspection are attached hereto at Exhibit 20).

- 13 -

**The Bomb Carousel**

69.    The bomb carousel also was not built according to my instructions.  The carousel element suspends U.S. military leaflet bombs (which, in their actual use, explode high in the air and drop pamphlets).  After December 17, 2006, MASS MoCA hung the leaflet bombs on the carousel far too low to convey any sense of objects exploding high in the air and dropping propaganda from the sky.  I wanted them hung high over the visitors' heads.  MASS MoCA also incorrectly placed the carousel before installing the playground and the airplane fuselage, and also installed a hand crank, originally proposed for a much smaller carousel, but completely inappropriate for a carousel of the size actually used.  (Correct copies of photographs from the August 27, 2007 inspection are attached hereto at Exhibit 21); *see also* Dec. 22, 2006 emails between J. Thompson and D. Birch ("I only had a hazy idea of how he wanted the bomb suspended (rusty chain) but no precise direction...") (MASS MoCA 18577-79) (A correct copy is attached hereto at Exhibit 22); Feb. 14, 2007 email from Dante Birch to Joe Thompson (MASS MoCA 03474) ("He already said to take down the bomb carousel.") (A correct copy is attached hereto at Exhibit 23).

**The Saddam Compound**

70.    The Saddam compound was also altered without my authorization.  My assistants and I constructed a "spiderhole" based on original pictures, recreating the hole (and the whole compound) in which Saddam Hussein had been found and captured.  I intended the "spiderhole" to appear as if it had been removed from the earth to use as evidence at a tribunal, like a heart taken out of a body.  This element of the installation was complete when I left on December 17, 2006 (and could be made into a stand-alone piece of art).  After I left in December, MASS MoCA rigged and hung the spiderhole in a manner that I never approved.  (Correct copies of photographs from the August 27, 2007 inspection are attached hereto at Exhibit 24).  *See also* Feb. 16, 2007 emails between Richard Criddle and Joe Thompson (MASS MoCA 17608-15) (A correct copy is attached hereto at Exhibit 25); March 8, 2007 emails between Richard Criddle and Joe Thompson (MASS MoCA 05891) (A correct copy is attached hereto at Exhibit 26).

71.    Without instructions, MASS MoCA also added a rolling ladder so that visitors could access and look into the hole. (Exhibit 24). *See also* March 8, 2007 emails between Richard Criddle and Joe Thompson (MASS MoCA 05891) ("The spiderhole needs to be budged about 1' to the west to make room for the stairway on it's west side and raised by 3' or so" and "So we will move the saddam hole forward (west) to accommodate our rolling ladder and adjust the height of the display") (Exhibit 26); April 27, 2007 email from Bridget Hanson to Richard Criddle (MASS MoCA 17012-13) ("~~Relocate rolling ladder to Saddam hole~~") (Exhibit 19). I had designed a different method using a cistern on a metal platform (which we had already obtained) to allow visitors to look in the spiderhole.

72.    The door in the Saddam kitchen area was not meant to allow visitors to see the "backstage area" (a hallway to an elevator). Without instructions or approval, MASS MoCA installed a chain link fence with barbed wire, through which a visitor can see the backstage area. Such a design of a fence also does not make any sense in this area. (A correct copy of a photograph from the August 27, 2007 inspection is attached hereto at Exhibit 27).

73.    I had wanted to use bamboo leaves to recreate the reeds weaved through the chain link fence in the Saddam compound area, but MASS MoCA was unable to obtain them. As one alternative, I had tried using corn husks, but had not settled on a final treatment. Without my approval or instruction, Joe Thompson directed MASS MoCA staff to add corn husks to this area. (A correct copy of a photograph from the August 27, 2007 inspection is attached hereto at Exhibit 28). *See also* May 1, 2007 email from Joe Thompson to Richard Criddle and Bridget Hanson (MASS MoCA 05869) ("So, as soon as that Saddam fence goes up, Bridget, can you put in some of that corn husk in range of say 3' off the ground to 6'4" - a band to sort of block the view. It doesn't have to be totally dense, or completely finished ... just something of a visual screen.") (A correct copy is attached hereto at Exhibit 29).

**The Cinema**

74.    MASS MoCA also changed parts of the cinema. In "Training Ground for Democracy," the cinema is abandoned. As in a typical projection booth, there are two windows

though which a film is projected with two projectors, but I did not intend any film projectors placed in the projection booth; instead a visitor would "project" her own collective memory when she looked through the empty windows. MASS MoCA, however, placed one antique film projector in the projection booth, which they acquired on their own initiative, thus changing the significance of the projection room to a visitor. (A correct copy of a photograph from the August 27, 2007 inspection is attached hereto at Exhibit 30). *See* Feb. 20, 2007 email from Bridget Hanson (MASS MoCA 15533-37) ("~~reconstruct projector~~") (A correct copy is attached hereto at Exhibit 31).

75.    In addition, several elements of the cinema were not accurately recreated. For example, without my instruction or approval, MASS MoCA changed the cinema seating. (A correct copy of a photograph from the August 27, 2007 inspection is attached hereto at Exhibit 32). *See also* Jan. 16, 2007 email from Joe Thompson to Richard Criddle and Dante Birch (MASS MoCA 17649-50) ("THE PATTERN I DESCRIBE WILL MAKE THE AISLES LINE UP BETTER WITH THE DOORS THAN IF WE SIMPLY COPIED THE RT 8 PATTERN.") (A correct copy is attached hereto at Exhibit 33). The change in the seating plan affects the original layout of the seats and the carpet in the cinema and interferes with the new installed doors. Also, the aisles between the seats are no longer aligned with the lights above.

76.    After December 17, 2006, MASS MoCA also installed an inappropriate projection screen in the cinema, without my instruction or approval. First, the cinderblock wall needed to be painted black, and the dismantled stand for the loudspeakers needed to be installed. My idea was to have a projection wall crumbling down and having remnants of a projection screen hanging from the ceiling. (A correct copy of a photograph from the August 27, 2007 inspection is attached hereto at Exhibit 34).

77.    In the cinema, MASS MoCA placed objects, including sleeping bags and other details, which would suggest that the cinema was being used as a temporary shelter, much like the New Orleans Superdome was following Hurricane Katrina, but on a much smaller scale. I gave no instructions as to how these items should be placed in the cinema, nor did I approve the

particular objects themselves. *See* Feb. 14, 2007 email from Joe Thompson to Nato Thompson (MASS MoCA 18552-53) (A correct copy is attached hereto at <u>Exhibit 35</u>). A rusty, dirty popcorn machine was placed in the concession area without my approval. *Id.* ("Move popcorn machine to southeast corner, and plug in.") (Correct copies of photographs from the August 27, 2007 inspection are attached hereto at <u>Exhibit 36</u>).

**House**

78.    Before I left MASS MoCA on December 17, 2006, I stated that no work should be done on the entrances to the house until I returned. Because the house was bigger than the other house in North Adams that I had selected, I wanted to see, for example, how the front entrance impacted the street area of the installation. I repeated my instructions in an email on December 23, 2006. *See* Dec. 22 and 23, 2006 emails between Dante Birch and me (BUC00001752-53) (<u>Exhibit 12</u>). Contrary to these instructions and without my approval, Joe Thompson gave instructions to MASS MoCA staff to work on the house entrances, (and they even cut an additional door in the back entrance way) and attached handles that were not the originals. *See* March 8, 2007 emails between Richard Criddle and Joe Thompson (MASS MoCA 05891) (<u>Exhibit 26</u>). (Correct copies of photographs from the August 27, 2007 inspection are attached hereto at <u>Exhibit 37</u>).

**The Police Car and French Barriers**

79.    Without my approval or instruction, MASS MoCA positioned the smashed police car in the wrong position (it also should be turned on its side) and surrounded it with French barriers (metal crowd barriers). *See* Feb. 20, 2007 email from Bridget Hanson (MASS MoCA 15533-37) ("~~pull police car out diagonal and leave it~~") (See <u>Exhibit 31</u>). The placement of the barriers around the police car changes the significance of both items. I intended the French barriers to go into a different part of the installation and to be adorned with flowers and objects as a memorial to a demonstrator who was killed. (A correct copy of my reference photograph is attached hereto at <u>Exhibit 38</u>; a correct copy of a photograph from the August 27, 2007 inspection is attached hereto at <u>Exhibit 39</u>).

- 17 -

**Unauthorized Detailing**

80.    MASS MoCA also attempted to add details to the exhibit, but did so incorrectly and without my instruction or approval.  For example, on top of one vehicle (gas station) was a sniper position.  The position was supposed to have a couch surrounded by sandbags.  Instead, there is one chair.  (A correct copy of my reference photograph is attached hereto at Exhibit 40; a correct copy of a photograph from the August 27, 2007 inspection are attached hereto at Exhibit 41).  MASS MoCA also arranged Muslim prayer rugs incorrectly and in the wrong direction in the Mosque area, without approval or instruction.  (A correct copy of a photograph from the August 27, 2007 inspection is attached hereto at Exhibit 42).  *See* Feb. 20, 2007 email from Bridget Hanson (MASS MoCA 15533-37) ("TOP OF SHOOTING GALLERY: ~~lay down prayer rugs~~") (Exhibit 31).

81.    Also without my approval or instruction, MASS MoCA placed other smaller objects in various scenes.  These objects are the "details" which I use to suggest particular narratives.  For example, MASS MoCA placed papers and files in the law office scene on top of the filing cabinets.  (Correct copies of photographs from the August 27, 2007 inspection are attached hereto at Exhibit 43).

**The Mobile Home**

82.    MASS MoCA, also without my instruction or approval, added entrances to the front and back of the mobile home.  *See* April 27, 2007 email from Bridget Hanson to Richard Criddle (MASS MoCA 17012-13) ("~~Front and rear steps of the mobile home (to be purchased from Home Depot ,appropriate style)~~") (Exhibit 19).  I did not approve of the placement or design of these entrances.  MASS MoCA built the front entrance incorrectly and the back entrance was added without any instruction.  I never intended a back entrance to the mobile home, as it was supposed to be an enclosed camp area.  (Correct copies of photographs from the August 27, 2007 inspection are attached hereto at Exhibit 44).

A/72189184.2/3006636-0000326542

**The Bar Was Removed**

83.    On the other side of the large room in Building 5, there is a smaller gallery space. I intended that area to house an American dive bar which would, among other details, show music videos made by American soldiers during the Iraq war.  When I left on December 17, 2006, the room was laid out and the bar was under construction.  MASS MoCA entirely eliminated this important element of "Training Ground for Democracy."  (A correct copy of a photograph from the August 27, 2007 inspection are attached hereto at Exhibit 45).  Without my approval, MASS MoCA removed the entire bar to make room for their exhibit "Made at MASS MOCA."

**The Tarps**

84.    The "view restricting devices," *i.e.*, tarps, used by MASS MoCA to cover the unfinished "Training Ground for Democracy" also further distort and misrepresent my art by modifying it in a manner that I did not intend or approve.  The tarps do not cover all of "Training Ground for Democracy" -- nor do they conceal the particular arrangement of elements and my design for how people flow through it.  MASS MoCA also added to the door of the cinema (a part of "Training Ground for Democracy") a written description of its "Made at MASS MoCA" exhibition.  (Correct copies of photographs from the August 27, 2007 inspection are attached hereto at Exhibit 46).

**The Display of an Unfinished "Training Ground for Democracy" Harms My Reputation as an Artist**

85.    "'Training Ground for Democracy,' as it existed on December 17, 2006, was an unfinished work of art.

86.    "Training Ground for Democracy" is currently unfinished, modified and distorted.

87.    I do not consent to the display of the unfinished, modified and distorted "Training Ground for Democracy."

88.    In its unfinished and distorted state, "Training Ground for Democracy" is not as I intended or conceived, and thus misrepresents my art.

89.    My reputation as an artist has been harmed by the display of "Training Ground for Democracy" in its unfinished state because it does not currently appear as I intended nor conceived, and thus misrepresents and distorts my art.  It is impossible for the viewing public and art critics to determine what portions of the unfinished "Training Ground for Democracy" represent my artistic creation, as opposed to the many modifications and distortions made by MASS MoCA.

90.    Several reviewers, including the Boston Globe's Art Critic, Ken Johnson, have noted the negative impact on my artistic reputation of displaying the unfinished "Training Ground for Democracy":

> [I]t does appear to me as an art critic that what Mass Moca has done certainly misrepresents Büchel's art.  Whether or not the exhibition is clearly labeled 'unfinished" and whether or not Büchel is identified as its author, many people are going to judge him and his work on the basis of this experience.  Indeed, one critic has already gone on record.  Writing in Commentary Magazine, Michael J. Lewis observed, "Having inspected it Thursday afternoon, I am not sure that is suffers from being enveiled.  On the contrary: just as most naked bodies benefit from clothing, the yellow shrouds hiding most of the exhibit add a note of complexity and mystery to what would otherwise be a rather simplistic exercise in political art."

Ken Johnson, *No Admittance*, Boston Globe, July 1, 2007 (*See* Head Aff. Ex. 8).

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.

Dated:    August 31, 2007

Christoph Büchel

A/72189184.2/3006636-0000326542